IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

LARRY OWEN SPEIGNER,
      Plaintiff,

vs.                             Case No. 5:09cv19/RS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

Plaintiff's application for DIB was denied initially and on reconsideration, and he appealed the denial to an administrative law judge ("ALJ") (Tr. 24–25, 65–67, 70, 73–75).[1] An administrative

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on May 6, 2009 (*see* Doc. 12; Docket Entry 13).

hearing was held on September 9, 2008 (Tr. 256–69). In a decision dated September 22, 2008, the ALJ found that Plaintiff was "not disabled" (Tr. 13–23). The Appeals Council denied Plaintiff's request for review on December 18, 2008 (Tr. 4–8), making the decision of the ALJ the "final decision" of the Commissioner and subject to judicial review in this court under 42 U.S.C. § 405(g). Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.     FINDINGS OF THE ALJ

On September 22, 2008, the ALJ made several findings relative to the issues raised in this appeal (*see* Tr. 13–23):

1)    Plaintiff last met the insured status requirements of the Act on June 30, 2007.[2]

2)    Plaintiff did not engage in substantial gainful activity during the time frame relevant to this appeal.

3)    Through Plaintiff's date last insured, he had the following severe impairments: low back pain, degenerative joint disease with facet arthropathy, degenerative disc disease with radicular features, and complaints of leg cramps.

4)    Through Plaintiff's date last insured, he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)    Through Plaintiff's date last insured, he had the residual functional capacity ("RFC") to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b).

6)    Plaintiff was not under a disability as defined in the Act during the time frame relevant to this appeal.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by

---

[2] Thus, the time frame relevant to this appeal is August 3, 2004 (alleged disability onset date) to June 30, 2007 (date last insured).

Case No. 5:09cv19/RS/EMT

substantial evidence or that proper legal standards were not applied."); *see also* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997); <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." <u>Boyd v. Heckler</u>, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* <u>Elam v. R.R. Ret. Bd.</u>, 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); <u>Falge</u>, 150 F.3d at 1322; <u>Lewis</u>, 125 F.3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her/his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.      Personal History

Plaintiff was born on February 26, 1949, and was fifty-four years old on the date he alleges he became disabled (Tr. 45).  At Plaintiff's hearing before the ALJ, held September 9, 2008, Plaintiff testified that he completed high school and thereafter took vocational courses in accounting and air conditioning and refrigeration services (Tr. 260).  Plaintiff testified that he could not return to his previous work, which includes work as a warehouse supervisor, sales manager, and sales representative, and he could not perform sedentary work because he can sit for only forty-five to sixty minutes, after which his leg muscles cramp, and he must walk around, exercise, or lie down (Tr. 261; *see also* Tr. 22).  Plaintiff noted that he takes an over-the-counter medication for his leg cramps (Tr. 262).  Plaintiff testified that if he is wearing the right type of shoes he can grocery shop, although he must recline "for a couple hours" after shopping (*id.*).  He also noted that his worst symptom is pain in the mid to lower back, and that he suffers from such pain three to four times a

day depending on his level of activity (Tr. 262–63). Plaintiff testified that when he experiences pain, which varies and lasts between fifteen and sixty minutes, he must stop whatever he is doing and sit down (*id.*). Plaintiff also reported that he has pain in his calves, which he described as "charley horse" type pain, which requires him to stop what he is doing and perform leg exercises to alleviate the pain (Tr. 263). Plaintiff noted that his leg cramps tend to occur early in the morning or when he is driving (Tr. 263–64). Plaintiff testified that he drove approximately fifty miles to his administrative hearing, and when he arrived he had to walk around "to get the charley horses out of [his] legs" (Tr. 264). Plaintiff further noted that he suffers from knee pain, caused by a "slip and fall" accident in a grocery store; arthritis in his back, hands, arms, and neck; an irregular heart beat, which causes dizziness; and loss of strength in his left arm, which he has broken on two occasions (Tr. 264–66). Plaintiff noted, however, that he was not seeing any physicians or receiving medical care at the time of his administrative hearing (*see* Tr. 261).

B.      Relevant Medical History

Plaintiff presented to an emergency room on August 3, 2004, after falling in a grocery store (Tr. 148). He complained of tightness in his right shoulder and pain in his lower back, right hip, right knee, and proximal part of the right tibia/fibula area (*id.*). A physical examination was essentially normal, revealing full range of motion in the right arm and shoulder and no tenderness with palpation to the lower back, hip, or knee, although Plaintiff complained of pain at the anterior portion of the proximal tibia (*id.*). X-rays of the lumbar spine and right hip, knee, and tibia/fibula were negative for any obvious fractures (*id.*).[3] Plaintiff was diagnosed with contusion of the right knee, lower leg and hip, and muscle strain of lower back and right hip (Tr. 149). Plaintiff was discharged the same day with prescriptions for Voltaren and Skelaxin (Tr. 147, 149).

On August 16, 2004, Plaintiff saw Dr. Steven Goodwiller, M.D., an orthopedic surgeon, for follow-up (Tr. 159). Plaintiff reported slow improvement but complained of pain and swelling over the anterior knee, as well as right "gastroc pain"[4] and pain in the lower back and neck (*id.*). Plaintiff

---

[3] The right hip x-ray revealed mild degenerative joint disease without evidence of subluxation (Tr. 151).

[4] "Gastroc" is believed to refer to the gastrocnemius muscle, a "superficial muscle of posterior (plantar flexor) compartment of leg." *See* www.medilexicon.com/medicaldictionary (last visited November 12, 2009).

told Dr. Goodwiller that his normal work—installing air conditioners—involved crawling and squatting and that he felt "he would be able to return to this [work] at present" (*id.*).[5] An examination revealed prominence of the right tibial tubercle and overlying tenderness, as well as swelling and tenderness in the prepatellar bursa anterior to the patellar tendon, but the medial and lateral joint lines were non-tender (*id.*). Plaintiff had full range of motion of the knee and stable ligaments (*id.*). Dr. Goodwiller noted "a little pain" in the gastroc with heel cord stretching and "a little mild tenderness" at the musculotendinous junction of the gastroc, but no high-grade tears were present (*id.*). Motor strength was good in the lower extremity groups, and "[q]uad and ankle jerk reflexes [we]re 2+ and symmetrical" (*id.*). X-rays of the right knee showed prominence of the tibial tubercle but were otherwise unremarkable (*id.*). Plaintiff was diagnosed with contusion of the right knee and mild strain of the right gastroc, and he was prescribed Celebrex (Voltaren was discontinued) (*id.*). Plaintiff was restricted from work and provided with instructions for back and patellofemoral exercises (*id.*). Plaintiff returned for follow-up on August 30, 2004 (Tr. 158). Dr. Goodwiller noted that Plaintiff was slowly improving, but he had left lateral hip pain radiating down the thigh, pain over the right anterior knee, pain in the gastroc over the musculotendinous junction, and neck and back pain (*id.*). Plaintiff was continued on a "no work" status (*id.*). During a follow-up visit on September 13, 2004, Plaintiff was again noted to be improving slowly, although he reported continued right leg pain, low back pain with radiation into the right lower extremity, and intermittent left leg numbness (Tr. 156). Examination revealed tenderness over the musculotendinous junction of the gastroc, but Plaintiff could perform a toe raise without pain, and gastroc motor strength was good bilaterally, although he had a mildly positive sitting root test on the right (*id.*). Dr. Goodwiller's diagnoses were right gastroc strain, contusion of the right knee, and possible lumbar radicular pain (*id.*). Plaintiff remained "unable to perform [his] <u>usual employment</u>," and a lumber magnetic resonance imaging ("MRI") was scheduled (*id.*) (emphasis added). The MRI, obtained September 13, 2004, revealed only a mild disc bulge posterolaterally on the right at L5-S1 and minimal midline bulge at L3-4 with no neural compression (Tr. 155, 157). Plaintiff returned to see Dr. Goodwiller on September 20, 2004 (Tr. 155). Dr. Goodwiller noted that Plaintiff

---

[5] Plaintiff's statement may have been recorded inaccurately, as other information in the record suggests that Plaintiff did <u>not</u> believe he could return to his normal work within two weeks of the "slip and fall" accident.

was "doing better" and "improving," had less leg pain, and had begun a walking program, although Plaintiff continued to report back pain and intermittent numbness and pain "on the left side" (*id.*). Dr. Goodwiller reviewed the MRI results, diagnosed Plaintiff with lumbar strain and right gastroc strain, and continued Plaintiff on a "no work" status, noting that—per Plaintiff's report—no light duty work was available (Tr. 155; *see also* Tr. 158). The last treatment record from Dr. Goodwiller is dated October 4, 2004, and the last record is not significantly different from Dr. Goodwiller's earlier treatment records (*see* Tr. 154). Plaintiff remained "off work" and was referred to Thomas Derbes, M.D., for treatment of the low back pain (*id.*).

On October 12, 2004, Plaintiff was examined by Dr. Derbes for complaints of mid and low back pain, right foot and leg pain, and left leg numbness (Tr. 200). Plaintiff described his pain as "continuous" and rated its intensity as a "seven" on a ten-point scale, although Plaintiff also stated that his pain was "improving" (*id.*). Plaintiff reported that his pain was aggravated by sitting, standing, bending, driving, and lifting, and that it was relieved by rest and exercise (*id.*). A physical examination of the lumbar spine revealed tenderness upon palpation at the L4-5 and L5-S1 facet joints, pain upon sitting, and a need to "push out of [a] chair when arising," but no trigger points were detected (*id.*). Plaintiff's gait was antalgic (*id.*). Motor strength in the upper and lower extremities was 5/5 throughout, and reflexes were generally normal bilaterally (*see* Tr. 201). Dr. Derbes diagnosed Plaintiff with chronic low back pain syndrome, secondary to degenerative joint disease ("DJD") with facet arthropathy and degenerative disc disease ("DDD") with radicular features (*id.*). Dr. Derbes discussed with Plaintiff various treatment options and advised Plaintiff to exercise and lose weight (*id.*). Plaintiff was placed on a light-duty work status with the following restrictions: no lifting greater than twenty pounds; no static squatting or prolonged bending, stooping, squatting, kneeling, ladder climbing, or crawling; no repetitive use of legs; and "no working in situations where the inability to use legs might put [Plaintiff] in a position for injury" (Tr. 202). Plaintiff was continued on Celebrex (*id.*). On October 21, November 4, and November 18, 2004, Plaintiff underwent lumbar facet injections at L4-5 and L5-S1 (Tr. 192–99, 202). Plaintiff returned to Dr. Derbes for follow-up on December 6, 2004 (Tr. 189). Plaintiff reported pain in the mid and low back, right and left legs and feet, and he again rated his pain as a "seven," although Plaintiff stated that Celebrex had improved his ability to function in certain areas, including getting

out of bed, walking, cleaning the house, physical functioning, and overall functioning (*id.*). Plaintiff's physical examination was essentially unchanged from his previous visit (*see id.*). Plaintiff next saw Dr. Derbes on December 20, 2004, at which time it was noted that Plaintiff's pain was improving, and Plaintiff rated his pain as a "six" (Tr. 186). It was also noted that the previous facet injections had improved Plaintiff's pain by 70% (Tr. 187). Plaintiff was prescribed physical therapy three times a week for one month (Tr. 185, 187).

Records from Bonifay Physical & Aquatic Therapy reflect treatment on twelve occasions, from February 21, 2005, through March 18, 2005 (*see* Tr. 160–81). Progress notes reveal that throughout his treatment Plaintiff made good progress, experienced less pain and soreness, and demonstrated "good," "much," or "increased" improvement in tolerating activity and exercise (*see* Tr. 169–179). Additionally, at Plaintiff's last visit he demonstrated "good" strength and trunk range of motion (Tr. 169). In a Discharge Summary dated March 21, 2005, the physical therapist noted that Plaintiff had reached maximum rehabilitation potential, but Plaintiff stated that he planned to get a new prescription for physical therapy and return in two to three weeks (Tr. 168). The file contains no evidence that Plaintiff renewed his prescription or returned for continued therapy.

Plaintiff returned to Dr. Derbes on March 21, 2005, for follow-up of his neck pain and mid and low back pain (Tr. 182). Plaintiff rated his pain as an "eight," untreated, but as a "five" with the use of Ultracet and Tylenol (*id.*). Plaintiff stated, however, that medication had not improved his ability to function in function in certain areas, including getting out of bed, walking, cleaning the house, physical functioning, and overall functioning (*id.*). Upon examination, palpation revealed tenderness at the L4-5 and L5-S1 facet joints with no trigger points (*id.*). Motor strength in the upper and lower extremities was 5/5 throughout, and sensory was intact and bilaterally symmetrical in the upper and lower extremities (Tr. 183). Plaintiff's diagnosis remained the same, he was advised to lose weight, and it was again noted that the previous injections improved Plaintiff's pain by 70% (Tr. 183–84). Plaintiff's work status was characterized as "unimproved," and it was noted that Plaintiff would be referred to "Dr. Reed" for treatment of lumbar DDD and DJD and to discuss surgical options (Tr. 184). It was also noted that Plaintiff should return to Dr. Derbes for follow-up after being seen by Dr. Reed (*id.*).

On July 6, 2005, Plaintiff underwent a physical examination by unknown source.[6] Plaintiff reported continuous pain, stiffness, and aching in the low back, as well as bilateral buttock and leg pain, pain in the mid back, and numbness in the left foot (Tr. 203). Plaintiff reported experiencing these symptoms since the "slip and fall" accident, and he noted that litigation concerning the accident was ongoing (*id.*). Plaintiff also described the treatment he had received since the fall and noted that treatment had "provided some response" (*id.*). Plaintiff reported that sitting, prolonged standing, walking, bending, lifting, and driving increase his pain (Tr. 203, 205). Plaintiff was noted to be obese and deconditioned (Tr. 204). Upon examination, Plaintiff's spine had normal cervical lordosis, increased thoracic kyphosis, and normal lumbar lordosis (*id.*). Plaintiff's pelvis was level, his gait pattern was normal, and he, though guarded in his movements, could flex the lumbar spine to the extent his fingertips met his knees (*id.*). Plaintiff complained of pain with palpation over the lumbar spine, and bilateral rotation and bending were limited "with 50% loss with complaints of pain" (*id.*). Spinal extension was normal, axial compression test and Gaenslen's sign were negative, and Plaintiff was able to stand on his heels and toes but unable to squat without support (*id.*). Plaintiff could sit from a standing position without support and transfer from a sitting position to a supine position and from a supine position to a sitting position, his patellar and Achilles reflexes were normal and symmetrical, he had no clonus at the ankle, and he had strong bilateral strength of the extensor hallucis muscle, bilateral anterior tibialis, bilateral peroneus brevis muscles, longus muscles, and bilateral flexor digitorum muscles with normal sensation in both legs (*id.*). Straight leg raising was restricted bilaterally at 90 degrees due to hamstring tightness while sitting (*id.*). Plaintiff had normal hip motion and no abdominal abnormalities, except his size (*id.*). Patrick's test was positive on the left with low back pain, and supine straight leg raising was restricted bilaterally to 70 degrees (right leg) and 75 degrees (left leg) due to hamstring tightness (*id.*). When Plaintiff was seated with his spine flexed he had full bilateral extension of the knees (*id.*). The report of this examination does not include a diagnosis, recommended course of treatment, or any opinion regarding Plaintiff's ability to work (*see* Tr. 203–05).

---

[6] The report prepared by the examining physician is missing pages and does not contain the physician's name; however, the report states that Plaintiff was referred by Dr. Derbes. Thus, it seems likely that the examining physician is Dr. Reed based on Dr. Derbes's intention—as reflected in his March 21 treatment note— to refer Plaintiff to Dr. Reed.

On August 23, 2005, on referral by Dr. Derbes, Plaintiff underwent an examination by Keith Zwingelberg, M.D., a board certified pain medicine physician (Tr. 214). Plaintiff complained of constant low back pain, right leg pain radiating to the ankle, and left leg numbness to the ankle, and he rated his "discomfort" as a "two" at its best and an "eight" at its worst (*id.*). Plaintiff noted that he had previously had some pain relief with physical therapy, massage, heat, and exercise, but he stated that the facet injections had not provided relief, and the Celebrex, while helpful, caused chest pain and increased blood pressure (*id.*). Dr. Zwingelberg noted that Plaintiff ambulated without difficulty (Tr. 215). Deep tendon reflexes in the legs were equal at the knees and ankles, no muscle spasm was noted paravertebrally or in the gluteal area, but sensation to fine touch was diminished along the lateral aspect of the left lower extremity from the knee to the ankle, and pain to palpation was present over the posterior spinous process of L5-S1 and paravertebrally bilaterally at L4-5 and L5-S1 (*id.*). Hyperextension of the spine produced increased pain in the lower back, but no pain was noted over the posterior superior iliac crests, bilateral sacroiliac joints, or sacral notches (*id.*). Straight leg raising was negative bilaterally, flexion of the hips was normal, and strength was 5+/5+ throughout the muscle groups of the lower extremities (*id.*). Dr. Zwingelberg reviewed the September 2004 MRI and diagnosed Plaintiff with facet arthropathy, mild right posterior posterolateral L5-S1 disc bulge, midline disc bulge at L3-4, and pseudoarthrosis at L5-S1 (Tr. 215–16). He recommended a bilateral lumbar dorsal medial branch block and radiofrequency (Tr. 216).

Plaintiff returned to Dr. Derbes on March 28, 2007, and lab tests were ordered, but there is no other information about this visit in the record except documents reflecting that Plaintiff was apparently diagnosed with depression and prescribed Lexapro (*see* Tr. 226–28, 230).[7]

---

[7] The file contains no evidence of treatment between August 23, 2005, and March 28, 2007.

C.      Other Information Within Plaintiff's Claim File

On July 28, 2005, a non-examining agency physician completed a Physical RFC Assessment (Tr. 206–13). The physician opined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit about six hours in an eight-hour workday (Tr. 207). Further, Plaintiff had the unlimited ability, subject to the foregoing restrictions, to push or pull, and no postural, manipulative, visual, communicative, or environmental limitations were established (Tr. 207–10).

In a "Report of Contact" form dated November 3, 2005, Plaintiff reported that his last doctor's appointment was the appointment with Dr. Zwingelberg on August 23, 2005, he had seen no new doctors, he was on no new medications, and no additional lab studies or x-rays had been obtained (Tr. 110). Plaintiff further reported that he lived alone and did all of his own cooking and household chores, such as laundry, and that he was able to drive short distances and walk "about a block" (*id.*).[8]

On November 4, 2005, a second non-examining agency physician completed a Physical RFC Assessment (Tr. 218–25). The physician rendered opinions consistent with those of the first agency physician concerning Plaintiff's physical capacities (*see* Tr. 219–22).

On June 30, 2008, at the ALJ's request, Plaintiff underwent a consultative examination by C.W., Koulisis, M.D., a board certified orthopedic surgeon (Tr. 231). Plaintiff complained of moderate to severe back pain and occasional numbness (*id.*). Upon examination, Dr. Koulisis noted that Plaintiff could arise without difficulty and upon standing had normal cervical lordosis, thoracic kyphosis, and lumbar lordosis (Tr. 232). Plaintiff also had a normal gait and was able to heel, toe, and tandem walk without difficulty (*id.*). Range of motion of the cervical spine was normal with negative Spurling's, no palpable spasm, "5/5" motor strength, "2+ and equal" reflexes, and intact sensation to light touch, pinprick, and vibration (Tr. 232, 234). Plaintiff's shoulders, elbows, wrists, and hands had full range of motion with no abnormalities (Tr. 232, 234–35). The thoracolumbar spine had full range of motion with no palpable spasm, "5/5" motor strength, "2+ and equal" reflexes, and intact sensation (Tr. 232, 234). The hips, ankles, and feet had normal range of motion

---

[8] In another report, dated February 13, 2007, Plaintiff reported that he could drive thirty to forty miles before he "start[ed] hurting" (Tr. 133).

(Tr. 232, 235–36). The knees had no effusion and normal patellofemoral mechanics throughout range of motion testing with full range of extension bilaterally, but decreased bilateral flexion at 130 degrees (out of a possible 150-degree range) (Tr. 232, 235). Moreover, the knees were stable to all stressors (Tr. 232). Dr. Koulisis reviewed x-rays of Plaintiff's lumbar spine, noted that no bony abnormalities were visible, and commented that the visible, mild degenerative changes were appropriate for Plaintiff's age (*id.*). Dr. Koulisis also reviewed the September 2004 MRI and noted that it revealed disc degeneration, degenerative changes to a variable degree throughout the lumbar spine, and a mild protrusion to the right of the midline L5-S1 area (*id.*). Dr. Koulisis's diagnosis was degenerative lumbar disc disease with complaints of left leg pain (Tr. 233). Dr. Koulisis completed a Medical Source Statement and opined that Plaintiff could continuously lift or carry up to one-hundred pounds without restriction and continuously sit, stand, or walk eight hours in an eight-hour workday (Tr. 237–38). He further opined that Plaintiff could continuously reach, handle, finger, feel, and push or pull with the upper extremities and could continuously operate foot controls with both feet (Tr. 239). Additionally, Dr. Koulisis opined that Plaintiff could continuously climb, balance, stoop, kneel, crouch, and crawl; he had no restriction in activities of daily living, such as shopping, preparing meals, or caring for his personal hygiene; and he had no environmental limitations other than a need to refrain from more than "occasional" exposure to vibrations (due to DDD and DJD) (Tr. 241–42).

Lastly, a vocational expert ("VE") testified at Plaintiff's hearing before the ALJ and characterized Plaintiff's past work as a warehouse supervisor (Dictionary of Occupational Titles ("DOT") # 929.137-022) as skilled, light work, as described in the DOT, and up to very heavy work as performed by Plaintiff; his past work as a sales manager (DOT # 163.167-018) as highly skilled, sedentary work, as described in the DOT, and up to very heavy work as performed by Plaintiff; and his past work as a building equipment and supplies sales representative (DOT #274.357-018) as skilled, light work, as described in the DOT, and up to very heavy work as performed by Plaintiff (Tr. 259). The VE noted that due to the highly-skilled nature of Plaintiff's past work, "plenty of jobs" would be available at any exertional level, including a light exertional level (*see* Tr. 267).

V.      DISCUSSION

Plaintiff states that he raises two issues in the instant appeal (Doc. 17 at 1).  Plaintiff first states the ALJ erred in failing to properly analyze his subjective complaints of pain and functional limitations (*id.*).  Second, Plaintiff states that the ALJ erred "by mechanically applying the Grids" (*id.*).  However, upon closer review, Plaintiff's grounds for relief appear to be  comprised of sub-parts, including allegations that the ALJ erred in failing to recontact Dr. Derbes and erred accepting the opinions of Dr. Koulisis over those of Dr. Derbes (*see id.* at 14, 16–19).  Thus, the undersigned will consider all of the foregoing issues, despite the characterization of this appeal as involving only two claims for relief.

A.      Evaluation of Plaintiff's Subjective Complaints

The ALJ summarized Plaintiff's hearing testimony regarding his pain and physical limitations, as the undersigned has done, *supra* (Tr. 19–20).  The ALJ then concluded that Plaintiff's statements were not credible to the extent those statements conflicted with a finding that Plaintiff could perform light work, as defined in 20 C.F.R. § 404.1567(b)[9] (*see id.*).

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from

---

[9] Light work is defined in 20 C.F.R. § 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the <u>Hand</u> test. <u>Wilson v. Barnhart</u>, 284 F.3d 1219 (11th Cir. 2002); <u>Kelley v. Apfel</u>, 173 F.3d 814 (11th Cir. 1999); <u>Elam v. Railroad Retirement Bd.</u>, 921 F.2d 1210, 1216 (11th Cir. 1991); <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Martin v. Railroad Retirement Bd.</u>, 935 F.2d 230, 233 (11th Cir. 1991); <u>Landry v. Heckler</u>, 782 F.2d 1551, 1553 (11th Cir. 1986).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." <u>Wilson</u>, *supra*, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the regulations and the <u>Hand</u> standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." <u>Elam</u>, 921 F.2d at 1215. The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992) (citing <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered. *Id.*; <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . . Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." <u>MacGregor v. Bowen</u>, 786 F.2d at 1054; <u>Holt v. Sullivan</u>, 921 F.2d at 1223. "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court. The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted). The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. <u>Jones v. Dep't of Health and Human Serv's</u>, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints of pain. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 649 (5th Cir. Sept. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[10] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." <u>Hand</u>, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." <u>Arnold v. Heckler</u>, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ referenced 20 C.F.R. § 404.1529 and applied the pain standard as set forth in <u>Hand</u>, 761 F.2d at 1549 (*see* Tr. 19). The ALJ acknowledged that Plaintiff has underlying medical impairments, but he found that objective medical evidence fails to confirm the severity of the alleged pain arising from those impairments (*see* Tr. 20). In support, the ALJ noted that x-rays taken immediately after Plaintiff's fall were negative (*id.*). Moreover, Dr. Koulisis, a board certified orthopedic surgeon, reviewed Plaintiff's x-rays and noted that the visible mild degenerative changes were appropriate for Plaintiff's age (Tr. 232). The ALJ also noted that the September 2004 MRI showed "only a <u>mild</u> disc bulge posterolaterally on the right at L5-S1 and <u>minimal</u> midline bulge at L3-4" (Tr. 20, 155, 157) (emphasis added). Furthermore, the MRI showed no neural compression (Tr. 155, 157). Thus, the ALJ did not err in finding that objective medical

---

[10] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to October 1, 1981 are binding precedent in the Eleventh Circuit. <u>Bonner v. Pritchard</u>, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Case No. 5:09cv19/RS/EMT

studies fail to confirm the severity of Plaintiff's alleged pain. Indeed, Dr. Koulisis reviewed both the MRI and x-ray results and concluded, essentially, that Plaintiff had no physical limitations whatsoever, except a need to refrain from more than occasional exposure to vibrations.

Likewise, the ALJ did not err in finding that Plaintiff's medically determinable impairments could not reasonably be expected to cause the degree of pain of which he complains. It is undisputed that the only opinions of any physician that Plaintiff could not work were those of Dr. Goodwiller, to the extent he placed Plaintiff on a "no work" status between August 16 and October 4, 2004. However, Dr. Goodwiller's work restriction was imposed shortly after Plaintiff's fall and concerned only a small portion of the time frame relevant to Plaintiff's DIB claim.[11] Furthermore, in restricting Plaintiff from work between August and October 2004, Dr. Goodwiller opined that Plaintiff could not return to his <u>usual</u> work; that is, work involving "a lot of squatting and at times crawling and installing air conditioners" and "a lot of lifting and pulling" (Tr. 158, 159). Dr. Goodwiller did not opine that Plaintiff was restricted from all work.[12] Additionally, as the ALJ noted, when Plaintiff saw Dr. Derbes on October 12, 2004, Dr. Derbes opined that Plaintiff could perform "light duty" work (Tr. 20, 202). *See* <u>Kelley v. Chater</u>, 62 F.3d 335, 338 (10th Cir. 1995) (in discounting claimant's allegation that he "needed a two-hour nap each day," ALJ considered that claimant never reported this to his physician and no physician opined that he was disabled, noting that, "in fact, three physicians [] opined that he retains the ability to perform at least some sedentary work"); <u>Singleton v. Astrue</u>, 542 F. Supp. 2d 367, 378–79 (D. Del. 2008) (in evaluating a claimant's credibility, ALJ did not err in considering, among other factors, that "none of [her] treating physicians identified any specific functional limitations . . . that would render her totally disabled"); *see also* <u>Choate v. Barnhart</u>, 457 F.3d 865, 870 (8th Cir. 2006) (discounting opinion of treating physician that claimant was "disabled," in part, because physician failed to explain why claimant could not perform a light or sedentary job).

---

[11] The court notes that the work restriction (covering a time frame of approximately a month and a half) falls far short of the twelve-month "duration requirement" necessary to establish disability for DIB purposes (that is, a "continuous period [of disability] of at least 12 months"). *See* 20 C.F.R. § 404.1509.

[12] On August 30, 2004, Dr. Goodwiller continued Plaintiff on a "no work status" <u>after</u> being advised by Plaintiff that no "light duty" work was available (*see* Tr. 158).

In further discounting Plaintiff's subjective complaints, the ALJ considered that Plaintiff was not under any doctor's care at the time of his administrative hearing and that his file contained no evidence of medical treatment between August 2005 (when Plaintiff was examined by Dr. Zwingelberg) and March 2007 (when Plaintiff returned to Dr. Derbes),[13] and no evidence of any treatment after March 2007.[14] A claimant's failure to seek treatment is a proper factor for the ALJ to consider. *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing); *see also* Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain); Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992) (absence of treatment indicates that a mental impairment is non-severe). Similarly, the ALJ noted that at the time of Plaintiff's hearing he was taking only over-the-counter medications and had not received prescription medications in more than one year (Tr. 21). Moreover, the record contains no evidence that Plaintiff was ever prescribed potent pain medications. *See* Harwell v. Heckler, 735 F.2d 1292, 1293 (11th Cir. 1984) (ALJ properly considered a variety of factors in discounting claimant's complaints, including his lack of regular use of potent pain medication). Although Plaintiff underwent lumbar facet injections, they were administered on only three occasions (in October and November 2004), and Dr. Derbes twice noted that the injections improved Plaintiff's pain by 70% (Tr. 184, 187).[15] *See* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.") (citation omitted).

---

[13] As noted *supra*, the file contains no detailed reports of March 2007 office visit with Dr. Derbes, and the reports that do exist suggest that Plaintiff primarily complained of depression-related symptoms.

[14] Although Plaintiff was examined by Dr. Koulisis in June 2008, this examination was performed at the behest of the ALJ.

[15] Dr. Derbes's records suggest that the "70% pain improvement" was based on Plaintiff's reports, as the records state as follows: "PROCEDURES DISCUSSED: PREVIOUS INJECTIONS IMPROVED PAIN BY 70%." (*see, e.g.*, Tr. 184). Plaintiff, however, subsequently stated to Dr. Zwingelberg that the injections had provided no relief (Tr. 214). The ALJ, therefore, also considered that Plaintiff's descriptions of his symptoms and limitations have been inconsistent (Tr. 21).

Next, the ALJ noted that Plaintiff's physical examination by Dr. Koulisis was essentially unremarkable and concluded that Plaintiff's complaints of disabling pain are inconsistent with Dr. Koulisis's findings and opinions—a conclusion that is clearly and substantially supported by the record (*see* Tr. 231–42 (Dr. Koulisis's report)).  The ALJ also noted that Dr. Koulisis is a board certified physician and "of the appropriate medical specialty to assess" Plaintiff's impairments and functional limitations (Tr. 22).  *See* 20 C.F.R. § 404.1527(d)(5) (providing that "more weight [is given] to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  Similarly, the ALJ noted that the opinions of the non-examining agency physicians, although generally entitled to less weight than those of a treating or examining physician, are also inconsistent with Plaintiff's allegations of disabling limitations and consistent with the ALJ's finding that Plaintiff is able to perform light work (Tr. 21).  As noted *supra*, each non-examining physician opined that Plaintiff could perform work consistent with the requirements of light-duty work.

The ALJ also considered Plaintiff's statements and concluded that some of Plaintiff's own statements suggest he is able to perform light-duty work (Tr. 21).  In pertinent part the ALJ noted Plaintiff's report in December 2004 that medication improved his ability to function (Tr. 21, 189), his report in July 2008 that he socialized at his country club (Tr. 21, 246), and his testimony that he was able to drive and grocery shop (Tr. 21).[16]  Similarly, Plaintiff reported in November 2005 that he lived alone, did all of his own cooking and household chores, and was able to drive short distances and walk "about a block" (Tr. 110), and in February 2007, he reported that he could drive thirty to forty miles before experiencing pain (Tr. 133).  Although Plaintiff's descriptions of Plaintiff activities show some limitations, as the ALJ noted (*see* Tr. 21), the ALJ was not required to "believe all of [Plaintiff's] assertions concerning [his] daily activities."  Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).

Lastly, the ALJ considered Plaintiff's "generally unpersuasive appearance and demeanor while testifying at [his] hearing," noting that they undermined his credibility (Tr. 21).  Under Social Security Ruling ("SSR") 96-7p the ALJ is permitted to "consider his or her own recorded

---

[16]  An ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms.  See Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).

observations of the individual as part of the overall evaluation of the credibility of the individual's statements." SSR 96-7p. Moreover, the ALJ specifically noted that his observations were only one of several factors he relied upon in discounting Plaintiff's subjective complaints (Tr. 21). *See* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) ("The Secretary relied on substantial evidence, including demeanor evidence, to conclude that [the claimant's] complaints were not credible.").

Thus, based on the foregoing, it is clear that the ALJ did not err in evaluating Plaintiff's credibility. The ALJ applied the correct pain standard and articulated reasons—with substantial support in the record—for finding Plaintiff less than fully credible. Plaintiff, therefore, is not entitled to relief on this claim.

B.      ALJ's Failure to Recontact Dr. Derbes

As noted *supra*, in discounting Plaintiff's subjective complaints the ALJ considered Plaintiff's lack of consistent medical care, including gaps in medical treatment between August 2005 and March 2007, as well as the lack of treatment after March 2007. Here, in alleging that the ALJ erred by failing to recontact Dr. Derbes, Plaintiff states that he "reported on his Request for Hearing paperwork that he had been to Dr. Derbes on August 15, 2005 (this office visit is nowhere in the record)," and that "he saw Dr. Derbes on March 28, 2007 (this office visit is incomplete)," and therefore, "it is unknown as to whether the claimant was treating with a physician from August 2005 to March 2007" (Doc. 17 at 14).[17] Thus, Plaintiff appears to contend that the ALJ erred in considering the lack of consistent medical care in evaluating Plaintiff's credibility, because the ALJ did not contact Dr. Derbes to ensure that he had all of Dr. Derbes's records. Plaintiff also contends that the ALJ erred by sending Plaintiff to Dr. Koulisis for a consultative examination without first recontacting Dr. Derbes "to make sure that all available medical evidence from his office was in the record" (*id.* at 16–17).

Initially, an ALJ need only recontact a medical source when evidence received from that source is inadequate to determine whether the claimant is disabled. 20 C.F.R. § 404.1512(e). And

---

[17] In the "Report of Contact" form dated November 3, 2005, Plaintiff reported that he had no medical treatment since his appointment with Dr. Zwingelberg on August 23, 2005 (Tr. 110). Thus, it is not "unknown" whether Plaintiff was treating with a physician in September or October 2005; by his own admission he was not.

in evaluating whether a source should be recontacted this court should consider "whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995) (quotations and citations omitted). "[T]here must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [Commissioner] for further development of the record." Graham, 129 F.3d at 1423. Here, the ALJ's failure to recontact Dr. Derbes did not prejudice Plaintiff and cannot constitute a failure to develop a full and fair record because there is sufficient evidence in the record regarding Plaintiff's condition, including evidence created by Dr. Koulisis following Plaintiff's comprehensive physical examination. Thus, there are no "evidentiary gaps" in the record that would have required the ALJ to recontact Dr. Derbes. The only gaps in the record are those created by Plaintiff's failure to seek medical treatment during the time frame relevant to his claim.

Although Plaintiff appears to assert that gaps exist because additional treatment records from Dr. Derbes exist and are missing, and the ALJ erred by failing to obtain them, the record before this court suggests that no such records exist. For example, when Plaintiff appeared before the ALJ on September 9, 2008, the ALJ confirmed that Plaintiff underwent the consultative examination by Dr. Koulisis, that he (the ALJ) had Dr. Koulisis's report, and that Plaintiff's file was now "up to date with" Plaintiff's medical situation (see Tr. 258). Neither Plaintiff nor his counsel indicated to the ALJ—in response to the foregoing comment or at any other time—that Plaintiff's file was missing records from Dr. Derbes. Moreover, even if Plaintiff was then unaware that his file lacked pertinent records (because he failed to avail himself of the opportunity to review his file at or prior to the administrative hearing),[18] Plaintiff did not submit any additional records to the Appeals Council from Dr. Derbes (see Tr. 4–7). Even before this court (in this case filed nearly two years after the date Plaintiff last saw Dr. Derbes) Plaintiff has supplied no records or materials demonstrating that additional relevant treatment records exist—Plaintiff merely speculates that such records exist by

---

[18] In the notice informing Plaintiff's counsel of the upcoming administrative hearing, counsel was advised that the ALJ would consider the evidence now in Plaintiff's file "and any additional evidence you provide" (see Tr. 59). Plaintiff was similarly advised (see Tr. 49, 51). Further, both Plaintiff and his counsel were advised that they had the right to review Plaintiff's file prior to the administrative hearing (see, e.g., Tr. 51, 59).

stating that "it is unknown as to whether the claimant was treating with a physician from August 2005 to March 2007."  Thus, Plaintiff has failed to establish that additional treatment records actually exist,[19] and correspondingly, has failed to establish that the ALJ erred in failing to obtain those records.  Similarly, Plaintiff has failed to establish that the ALJ erred in considering Plaintiff's lack of consistent and ongoing medical care in evaluating his subjective complaints.

Plaintiff next contends that the ALJ erred in referring him to Dr. Koulisis for a consultative examination without first contacting Dr. Derbes to ensure that Plaintiff's file contained all of Dr. Derbes's records (*see* Doc. 17 at 16–17) (citing 20 C.F.R. § 404.1512(f)[20]).  Plaintiff's contention, however, is without merit.  As previously noted, to the extent Plaintiff contends additional records from Dr. Derbes exist and establish the severity of his impairments, Plaintiff was responsible for providing the records.  20 C.F.R. § 1512(c).  Moreover, the court notes that Plaintiff's hearing before the ALJ was originally scheduled for March 12, 2008, and Plaintiff appeared on that date with counsel (*see* Tr. 251–55).  The ALJ stated to Plaintiff's counsel that Plaintiff "was never given the opportunity to get any [consultative examinations], and obviously, he [is] entitled to that" (Tr. 253).  The ALJ then specifically asked Plaintiff's counsel whether he believed Plaintiff needed an orthopedic consultative examination, and counsel responded that he did so believe, noting that Plaintiff's treating physicians were not specialists and that Plaintiff needed to be seen by specialists (both a psychological and orthopedic specialist) (Tr. 253–54).  Thereafter, Plaintiff was referred for consultative examinations, including the one performed by Dr. Koulisis.  Thus, the record reflects

---

[19] The Regulations provide that a claimant is responsible for "provid[ing] medical evidence showing that you have an impairment(s) and how severe it is during" the relevant time frame.  20 C.F.R. § 1512(c).  Thus, even <u>if</u> additional records from Dr. Derbes exist, establish an impairment, and demonstrate the severity of the impairment, Plaintiff was responsible for obtaining the records.  Indeed, the form for use in DIB applications specifically states that, "I understand that I must provide medical evidence about my disability, or assist the Social Security Administration in obtaining the evidence." (*see, e.g.*, Tr. 85).

[20] 20 C.F.R. § 404.1512(f), titled "Need for Consultative Examination," provides in relevant part:
If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense. . . .   Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources.  However, in some instances, such as when a source is known to be unable to provide certain tests or procedures or is known to be nonproductive or uncooperative, we may order a consultative examination while awaiting receipt of medical source evidence.  We will not evaluate this evidence until we have made every reasonable effort to obtain evidence from your medical sources.

that Plaintiff assented to—indeed encouraged—the referral to Dr. Koulisis, of which he now complains. Furthermore, Section 404.1512(f) provides that consultative examinations will generally not be requested until every reasonable effort has been made to obtain evidence from a claimant's medical sources. 20 C.F.R. § 404.1512(f). Here, however, the ALJ had the necessary evidence from Plaintiff's treating sources, including Dr. Derbes (as discussed, *supra*); therefore, the ALJ did not err in referring Plaintiff to Dr. Koulisis for a consultative examination without first requesting additional treatment records from Dr. Derbes.

Accordingly, the ALJ did not err in failing to recontact Dr. Derbes, and Plaintiff is not entitled to relief on this claim.

C.    Evaluation of the Opinions of Dr. Derbes and Dr. Koulisis

Plaintiff appears to assert that the ALJ erred in accepting the opinions of Dr. Koulisis over those of Dr. Derbes (*see* Doc. 17 at 16). In support, Plaintiff notes that Dr. Koulisis's examination was conducted on June 30, 2008, after Plaintiff's date last insured, whereas Dr. Derbes assessed Plaintiff's abilities during the relevant time frame (Doc. 17 at 16).

Initially, Plaintiff has not identified any opinion of Dr. Derbes that was rejected by the ALJ.[21] Additionally, the court notes that on October 12, 2004, Plaintiff's first visit with Dr. Derbes, Plaintiff was placed on a light-duty work status, which Dr. Derbes characterized as work involving no lifting greater than twenty pounds; no static squatting or prolonged bending, stooping, squatting, kneeling, ladder climbing, or crawling; no repetitive use of legs; and "no working in situations where the inability to use legs might put [Plaintiff] in a position for injury" (Tr. 202). Plaintiff then underwent facet injections (in late October 2004 and early and mid-November 2004), and Dr. Derbes reported that the injections improved Plaintiff's pain by 70%. In February and March 2005 Plaintiff participated in physical therapy, where—throughout the therapy—he made good progress, experienced less pain and soreness, and improved his tolerance for activity and exercise. Plaintiff returned to Dr. Derbes after his physical therapy had concluded, and despite Plaintiff's pain

---

[21] Moreover, Plaintiff does not contend that Dr. Derbes's opinions—if fully accepted—would compel a conclusion that Plaintiff is "disabled"; rather, Plaintiff appears to assert that if Dr. Derbes's opinions and Plaintiff's subjective complaints are fully accepted, Plaintiff would be unable to perform light work (*see* Doc. 17 at 17). As previously discussed, however, the ALJ properly discounted Plaintiff's subjective complaints.

improvement from both the facet injections and physical therapy, Dr. Derbes continued Plaintiff on the same work status (that is, light duty). However, the "light duty work" status, as characterized by Dr. Derbes, is generally consistent with the definition of "light work" found in the Regulations (*see* 20 C.F.R. § 404.1567(b); footnote 9, *supra*). To the extent the two conflict, and any opinion of Dr. Derbes was rejected, in doing so the ALJ noted Plaintiff's improvement since March 2005 (e.g., as evidenced by Dr. Zwingelberg's examination, Dr. Koulisis's examination, and Plaintiff's ability to perform various daily activities (*see* Tr. 20–22)), as well as the fact that Dr. Derbes had not treated Plaintiff since March 2005. Thus, the undersigned finds no error in the ALJ's consideration of Dr. Derbes's opinions.

Likewise, the court finds no error in the ALJ's consideration of the opinions of Dr. Koulisis. Although Plaintiff was consultatively examined by Dr. Koulisis in June 2008 (which was after June 30, 2007, Plaintiff's date last insured), in March 2008 Plaintiff encouraged the ALJ to order the consultative examination, asserting that it was necessary for Plaintiff to be examined by a specialist such as Dr. Koulisis. Moreover, the consultative examination was necessary to fill in "evidentiary gaps" created by Plaintiff's lack of treatment during the relevant time frame. Furthermore, the ALJ did not adopt Dr. Koulisis's opinion that Plaintiff, essentially, had no physical limitations; rather, the ALJ found Plaintiff capable of performing only light work. The ALJ's finding, which is far more restrictive than the opinions of Dr. Koulisis, is fully consistent with the opinions of the non-examining agency physicians and largely consistent with the opinions of Dr. Derbes—all of whom rendered opinions during the time frame relevant to Plaintiff's claim and all of whom rendered opinions based on treatment records created during the relevant time frame.

D.      ALJ's Finding at Step Four/Five

Lastly, Plaintiff contends the ALJ erred in "mechanically applying the Grids" (Doc. 17 at 16). In support, Plaintiff appears to contend that the ALJ found Plaintiff capable of performing the "full range of light work," but Dr. Derbes's opinions restricted Plaintiff from performing the full range of light work, and it was therefore error to rely exclusively on the medical vocational guidelines (or "grids"[22]) (*see id.* at 17).

---

[22] In 1978 the Commissioner promulgated medical vocational guidelines to help alleviate the need for vocational expert testimony to determine whether work existed in the national economy within the plaintiff's capabilities. 20 C.F.R. Part. 404, Subpart P, Appendix 2 § 200.00. "Where a plaintiff's qualifications correspond to the job requirements

Plaintiff's argument is without merit. First, to the extent Plaintiff contends the ALJ erred in his consideration of Dr. Derbes's opinions, Plaintiff's argument fails for the reasons set forth *supra*, and the ALJ's finding that Plaintiff could perform the full range of light work is supported by the record. Second, the ALJ did not rely on the grids—they are mentioned nowhere in his decision. Indeed, this case was decided at step four of the sequential evaluation, with the use of VE testimony. *See* 20 C.F.R. § 404.1560(b)(2) (the Regulations permit an ALJ to obtain VE testimony at step four, where a claimant is found "not disabled" if his impairments do not prevent him from doing his past relevant work); 20 C.F.R. § 1520(a)–(g).[23] As previously noted the VE testified that Plaintiff could return to his past relevant work as that work is described in the DOT and generally performed (that is, at the light or sedentary exertional levels), and further, that work at the light exertional level was available (Tr. 259). Thus, relying on the testimony of the VE, the ALJ properly found at step four that Plaintiff was not disabled because he could return to his past relevant work. Although the ALJ found that Plaintiff was capable of performing the full range of light work, as is often found in cases decided at step five, the ALJ here did not reach step five, rely on the grids, or find that Plaintiff could perform <u>other</u> work available in the national economy (that is, work other than Plaintiff's past relevant work). Accordingly, the court finds no error.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

---

identified by a [grid] rule, the guidelines direct a conclusion as to whether work exists that the plaintiff could perform. If such work exists, the plaintiff is not considered disabled." <u>Heckler v. Campbell</u>, 461 U.S. 458, 462, 103 S. Ct. 1952,1955, 76 L. Ed. 2d 66 (1983).

[23] The grids are employed at step five. *See* 20 C.F.R. § 404.1569 (grids applied "in cases where a person is not doing substantial gainful activity <u>and is prevented by a severe medically determinable impairment from doing vocationally relevant past work</u>") (emphasis added); 20 C.F.R. Part. 404, Subpart P, Appendix 2 § 200.00 (same).

At Pensacola, Florida this 9<u>th</u> day of December 2009.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### <u>NOTICE TO THE PARTIES</u>

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**